# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
July 9, 2013

No. 12-10652

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

MICHAEL J. SIGNORETTO,

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:09-CR-141-2

Before SMITH, HAYNES, and GRAVES, Circuit Judges.

PER CURIAM:[*]

Michael Signoretto ("Signoretto") appeals his conviction following a jury trial on one count of conspiracy to commit wire fraud and one count of conspiracy to obstruct an official proceeding. We AFFIRM.

## I. Background

This appeal arises from a complex conspiracy known as a "bust-out" scheme. We recite only the facts necessary to an understanding of our disposition of the issues Signoretto raises.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-10652

The conspirators purchased London Digital Limited ("LDL"), a telecommunications company in the United Kingdom. In layman's terms, LDL functioned as a "middle man" between network owners such as British Telecom ("BT") and brokers and wholesale buyers of long-distance time in the secondary market. The nominal purchaser and CEO of LDL was Steven Jamieson ("Jamieson"), formerly the CEO of a Dallas telecom company. Signoretto recommended Jamieson to the conspirators after declining the "front man" role for himself.

The conspirators also established Nationwide Call Company ("NCC") in the United States. NCC was run by Jeffrey Hemmer ("Hemmer"), a former employee of Jamieson's. It collected payments on LDL's behalf and was later "purchased"—in a sham transaction—by a Spanish company called FOCOS, which the conspirators also secretly owned. The conspirators engineered an elaborate deception to give the appearance that FOCOS was controlled by an unknown individual using the alias "Brian Kent."

Signoretto's role in the "bust-out" scheme was two-fold. First, he served as a confidant to Jamieson, with whom he stayed in frequent contact. That liaison served the dual purposes of allowing Signoretto to calm Jamieson's increasingly frayed nerves while keeping another conspirator updated on the scheme's progress. Second, after Hemmer emerged as the conspiracy's weak link, Signoretto discreetly provided him with funds. On at least four occasions, Signoretto dropped off money at a Dallas hotel for Hemmer's use. The money was primarily intended, and used, to pay Hemmer's legal bills and related expenses. Before the last drop, which occurred in December 2008, the FBI prompted Hemmer to ask for $1,500 so that he would have money to buy a plane ticket out of the country.

Taking advantage of favorable credit from BT and MCI Worldcom (now Verizon), the conspirators diverted funds owed to LDL from NCC to FOCOS, and

2

No. 12-10652

onward to the conspirators' bank accounts. Some conspirators received a share of the profits, while Hemmer, Signoretto, and others were paid a flat fee.

As arranged, LDL was eventually placed into administration (the British analog of bankruptcy). The conspirators attempted to blame LDL's collapse on FOCOS's failure to pay LDL. They even orchestrated sham meetings between Jamieson and "Kent"—who was not even present—in order to buy more time from BT and MCI while the "bust-out" was still in progress.

In an attempt to collect monies owed to LDL by NCC and FOCOS, the British administrators commenced a bankruptcy action in the Northern District of Indiana ("the Indiana bankruptcy proceeding").[1] Hemmer was deposed numerous times. From the conspirators' perspective, the first three depositions did not go well: Hemmer botched an attempt to invoke the Fifth Amendment, and was chastised by the judge for his evasive and contradictory answers. Prior to Hemmer's fourth deposition, the conspirators pressured him to leave the country, or, alternatively, to continue lying.

Unbeknownst to the conspirators, Hemmer had begun cooperating with the Federal Bureau of Investigation ("FBI"). The fourth deposition went forward in November 2008 at the behest of federal agents, who feared cancelling it would tip off the conspirators. The FBI also vetted the deposition outline provided by the British administrators' attorneys and made requests to avoid certain areas of questioning: the goal was to keep Hemmer from perjuring himself (or revealing his cooperation) by avoiding certain "off-limits" topics.[2]

In late November 2008, the FBI secured permission to wiretap Signoretto's telephone. The wiretap application included a 57-page affidavit from FBI

---

[1] The service agreement between LDL and FOCOS, executed in connection with the sale of NCC to FOCOS, specified Indiana as the forum.

[2] Neither Hemmer's attorney nor the district judge was aware of Hemmer's cooperation.

No. 12-10652

Special Agent Matt Segedy (the "Segedy affidavit"). In conversations recorded pursuant to the wiretap, Signoretto made numerous incriminating statements. For example, he discussed receiving a $400,000 fee for his participation in the conspiracy and repeatedly advised Jamieson to leave the country.

After the conspiracy was exposed, most of its participants, including Signoretto, were arrested. Some conspirators, including Hemmer, pleaded guilty. Signoretto stood trial alone on one count of conspiracy to commit wire fraud ("Count 1") and one count of conspiracy to obstruct an official proceeding ("Count 11").

Prior to trial, the district court denied Signoretto's motion to suppress the wiretap evidence and declined to hold an evidentiary hearing. The district court also quashed Signoretto's attempt to subpoena documents from the civil attorneys who took Hemmer's fourth deposition. During trial, Signoretto moved to dismiss the prosecution and for acquittal based on his claim that the November 2008 deposition was a "sham deposition." Both motions were denied, as were Signoretto's post-trial motions for a new trial and judgment of acquittal. Following an adverse jury verdict, the district court imposed concurrent 84-month prison sentences and restitution. This timely appeal followed.

## II. Discussion[3]

### A. *Franks* Hearing

Signoretto argues that his motion to suppress the wiretap evidence should not have been denied without holding a *Franks* hearing. *See Franks v. Delaware*, 438 U.S. 154 (1978). He argues that a *Franks* hearing was required because of certain inaccuracies in the Segedy affidavit. Because the premise

---

[3] At oral argument, Signoretto addressed a number of issues not raised in his briefing. We consider only the arguments actually raised in his opening brief. *See Tharling v. City of Port Lavaca*, 329 F.3d 422, 430 (5th Cir. 2003) (party waived issue by failing to raise it in opening brief).

underlying a warrant is that it is based upon truthful information, a hearing is required "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in [a] warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155–56. Although *Franks* dealt with warrants and our case involves a wiretap authorization under 18 U.S.C. § 2518, "[w]here, as here, [an] affidavit falls squarely within the dictates of section 2518, application of the *Franks* standard is . . . appropriate." *United States v. Guerra-Marez*, 928 F.2d 665, 670 (5th Cir. 1991) (emphasis removed). A defendant seeking a *Franks* hearing must establish that material misstatements or omissions are contained in the supporting affidavit and that if those statements were excised (or the omitted information included), the affidavit would be insufficient to support the warrant (or, in this case, the wiretap authorization). *See United States v. Privette*, 947 F.2d 1259, 1261 (5th Cir. 1991). Only then is an inquiry into the good faith of the affiant by way of a *Franks* hearing necessary to determine whether the information obtained should be suppressed. *See United States v. Looney*, 532 F.3d 392, 394 (5th Cir. 2008) ("[E]ven if the defendant proves that one or more statements in the affidavit are false, and yet fails to prove that the affiant deliberately or recklessly included such false information in the affidavit, the court may consider the entire affidavit—without any excision—under the good-faith exception to the exclusionary rule.").

Signoretto challenges: (1) the reference to his participation in the Gambino crime family as untrue (based upon his self-serving denials);[4] (2) the Indiana judge's omission of certain findings about Hemmer that bear on his credibility;

---

[4] We conclude that there was some evidence to support this allegation and that Signoretto's conclusory denial does not raise a question about whether a material misstatement was made in this regard.

No. 12-10652

and (3) the omission of certain known information about the money trail among the affected organizations. "We review the denial of a *Franks* hearing *de novo*." *United States v. Martin*, 332 F.3d 827, 833 (5th Cir. 2003). "An application for a wiretap must demonstrate probable cause to believe that the target has committed, is committing, or will commit a crime, as well as 'probable cause for belief that particular communications concerning that offense will be obtained through such interception.'" *United States v. Bankston*, 182 F.3d 296, 305 (5th Cir. 1999) (quoting 18 U.S.C. § 2518(3)(a)-(b)), *rev'd on other grounds sub nom. Cleveland v. United States*, 531 U.S. 12 (2000). Additionally, the statute requires a showing of necessity for the use of wiretaps to obtain the information sought. *See* 18 U.S.C. § 2518(1)(c).

We conclude that, with or without the challenged sections, the Segedy affidavit supports the wiretap authorization. First, as to probable cause, even reconstructed as Signoretto wishes, the Segedy affidavit contains voluminous evidence of his role in the conspiracy, in the form of consensually recorded telephone calls and visual surveillance. A reconstructed affidavit would give the reviewing judge probable cause for concluding that monitoring Signoretto's telephone would uncover evidence of wrongdoing.

As far as necessity, the Segedy affidavit thoroughly explained the need for wiretaps. As the district court noted, even if the Government knew where the money was, "[t]he affidavit explained  that . . . traditional methods were not likely to uncover the full extent of the conspiracy." "[T]his court has repeatedly upheld the issuance of a wiretap authorization where, as in this case, the government sought to expand its investigation into the full scope of a criminal enterprise, and traditional investigative techniques, though productive of some evidence, could not reveal that scope." *United States v. Butler*, 477 F. App'x 217, 220–21 (5th Cir. 2012) (unpublished) (collecting cases). We conclude that the

6

district court did not err in denying a *Franks* hearing before denying the motion to suppress.

B.  Ability to Present a Defense

Signoretto argues that he was denied his Sixth Amendment right to present his defense because of certain evidentiary and discovery rulings the district court made.  *See Washington v. Texas*, 388 U.S. 14 (1967). His "sham deposition" defense centered on Signoretto's contention that the November 2008 deposition of Hemmer was a "sham" because by that time Hemmer was cooperating with authorities and the deposing attorney had agreed to limits on his questioning requested by government agents.

Ordinarily, neither a district court's evidentiary rulings nor its jury instructions will be disturbed but for an abuse of discretion.  *United States v. Fuchs*, 467 F.3d 889, 900 (5th Cir. 2006); *United States v. Masat*, 948 F.2d 923, 933 (5th Cir. 1991).  To the extent that Signoretto makes a statutory construction claim, we review a ruling on such a claim de novo where error is preserved.  *United States v. Quintana-Gomez,* 521 F.3d 495, 496 (5th Cir. 2008). Alleged violations of a defendant's Sixth Amendment right to present a complete defense are reviewed de novo.  *United States v. Skelton*, 514 F.3d 433, 438 (5th Cir. 2008).

An evidentiary ruling resulting in exclusion of defense evidence is not automatically a Sixth Amendment violation, contrary to the implications of Signoretto's argument.  He relies principally on *Washington*, which did not involve a routine evidentiary or discovery ruling.  *See* 388 U.S. at 16–17. Instead, that case involved a Texas statute that barred defendants from calling accomplices to testify on their behalf.  *Id*.  *Washington* stands for the proposition that the Sixth Amendment right to compulsory process applies to the states.  *Id*.

at 18–19.[5] Even assuming arguendo that the "sham deposition defense" is a viable defense, the alleged evidentiary and discovery rulings here fall far short of denying Signoretto the right to obtain witnesses through compulsory process.

Although the district court placed some limits on his evidentiary presentation, Signoretto *was* allowed to cross-examine both FBI Agent Segedy and one of the attorneys who deposed Hemmer, Chris Gair about the deposition. Thus, his argument that the deposition was a "sham" was presented to the jury. While Signoretto was precluded from obtaining certain billing records from Gair's firm, he failed to show the relevance of these materials to the district court (or on appeal). Finally, his claim that he was improperly denied the ability to copy Forms 302[6] also fails to establish reversible error. Forms 302 generally are not discoverable, *see United States v. Williams*, 998 F.2d 258, 269 (5th Cir. 1993), yet Signoretto was permitted to examine and transcribe them.

C. Validity of Sham Deposition Defense

Finally, Signoretto challenges the jury instructions and the failure to quash the indictment based upon his contention that his "sham deposition defense" either should have been granted as a matter of law or should have been presented to the jury. We conclude that the "sham deposition defense" is no defense at all to Count 11 (and, by extension, Count 1). Signoretto was charged with conspiracy to obstruct the *Indiana bankruptcy proceeding,* not the

---

[5] *Crane v. Kentucky*, 476 U.S. 683, 690–91 (1986), is also inapposite here. In that case, the Court held that a pretrial ruling that a confession was voluntary could not operate to bar defense evidence calling into question the credibility of the confession. *Id.* at 688–89. Signoretto's argument that he was denied the "crucible of meaningful adversarial testing" is unmoored from the context of that quote which involved the right to effective counsel. *See United States v. Cronic*, 466 U.S. 648, 666 (1984) (holding that the fact that inexperienced counsel was appointed shortly before the trial date did not automatically lead to the conclusion that "counsel failed to function in any meaningful sense as the Government's adversary.").

[6] A Form 302 is the FBI's written record of an interview exchange between an FBI agent and a witness.

November 2008 deposition. The deposition in question was part of a real proceeding and was ordered by a real judge who was not "in" on any deception or cooperation with authorities. Signoretto made efforts both before and after that deposition to cause Hemmer either to lie or to disappear in order to protect the conspiracy from discovery in that proceeding. We conclude that the circumstances surrounding the November 2008 deposition do not present a "defense" or "failure of proof." Thus, the district court's rulings to that effect were not error.

AFFIRMED.